Harry H. BOUCHER et ux., Appellants,

v.

TEXAS TURNPIKE AUTHORITY,
Appellee.

No. 7062.

Court of Civil Appeals of Texas.

Texarkana.

Sept. 23, 1958.

Rehearing Denied Oct. 28, 1958.

————◆————

Gragg & Storey, Dallas, for appellants.

Locke, Locke & Purnell, Charles G. Purnell, Jess Hay, Dallas, for appellee.

CHADICK, Chief Justice.

This is a condemnation suit appealed from County Court at Law No. 1, Dallas County, Texas, and transferred to this Court from the 5th District by an equalization of dockets order of the Supreme Court. The judgment of the trial court is affirmed.

In June, 1956, the Texas Turnpike Authority, appellee herein, filed its original petition in condemnation against appellants, Harry H. Boucher and his wife, Sally Boucher, seeking to condemn six separate tracts of land belonging to the Bouchers, taking in fee three parcels and perpetual drainage easements upon the others. The Bouchers appealed the Special Commissioners' award to the County Court and among other objections denied specifically the Authority's right and power to condemn easements for drainage purposes.

Prior to trial on the merits the County Court sustained the Authority's motion for partial summary judgment. Then, following a jury trial at which the only issues submitted pertained to damages, the trial court upon the basis of the jury's answers entered judgment awarding the Authority the fee and easement interests sought in the six parcels of land and the Bouchers $5,150 for the taking of their property.

The Bouchers have perfected this appeal and seek reversal upon five points of error. In considering their points, such additional facts will be stated as are necessary for an understanding of the disposition of the question raised. The Bouchers' first point asserts that the court erred in not overruling the Authority's motion for partial summary judgment.

Article 6674v, Vernon's Ann.Rev.Civ.St. of Texas, Chap. 410, Acts 1953, 53rd Leg., Reg. Sess., established the Texas Turnpike Authority. From the Act are quoted portions necessary to consider in disposing of the contention.

"The word 'Project' or the words 'Turnpike Project' shall mean any express highway or turnpike which the Authority may at any time determine to construct under the provisions of this Act * * * together with all property rights, easements and interests which may be acquired by the Authority for the construction or operation of the Project * * * (Sec. 4(c)).

"Section 8. Condemnation of Property * * * the Authority is hereby authorized, and empowered to acquire, by the exercise of the power of condemnation and in accordance with and subject to the provisions of any and all existing laws and statutes applicable to the exercise of the power of condemnation of property for public use, any land, property rights, rights-of-way, franchises, easements or other property deemed necessary or appropriate for the construction or the efficient operation of any Turnpike Project or necessary to the restoration of, public or private property damaged or destroyed; provided, however, the Authority may not condemn any land except such as will be necessary for road and right-of-way purposes. The road and right-of-way purposes for which the Authority may condemn land shall include the land necessary for access, approach, and interchange

roads, but shall not include any supplemental facility for other purposes * * *

"In addition to any other power granted in this Act, the *powers* and procedure *granted to* and available to the *State Highway Commission* for acquisition of property, *are* likewise *granted to* and made available to *the Authority,* subject to the provisions of this Act. (Emphasis ours.) * * *

"Sec. 23. *Act Liberally Construed.* This Act, being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof."

Following the appellants' brief and the order in which they present their argument, considered first is the appellants' contention that the statutory powers of the Authority are so limited that it cannot condemn land for drainage purposes under the circumstances of this case where it is admitted that the drainage is not of the roadway adjacent to and immediately parallel to the drainage easement. Such contention cannot be sustained under a proper construction of the statute. The appellants in support of this point of error direct attention to and rely upon the proviso of Section 8 defining "road and right of way purposes" and excluding "supplemental facilities" from such purposes.

For the purpose of their argument the appellants make the basic assumption that a drainage easement is a supplemental facility without discussing or attempting to justify that postulate. It is to be noted that in the restrictive proviso it is stated road and right of way purposes "shall include" land necessary for access, approach and interchange roads. The use of the language "shall include" indicates a recognition by the Legislature that road and right of way purposes are broader and inclusive of more subjects than those specifically named and makes no effort to limit or define the entire field other than to include those named. Immediately following the specific designation of access, approach and interchange roads as being a use within the purposes, the proviso uses its only exclusory language: "but shall not include any supplemental facility for other purposes." This language, together with the grant of the same power exercisable by the Highway Commission, reasonably construed to carry out the purposes of the act, means that the Authority has no power to acquire by condemnation facilities supplementary to those for road and right of way. "Supplemental" in the statute means "additional to what is normal, ordinary or usual." Some dictionaries define the word to mean "something added," "secondary." Drainage of surface waters affecting a road and right of way whether the flow of water be onto, alongside or off of the project is not a secondary consideration in its construction and provisions for efficient drainage is not additional to the normal, ordinary and usual uses to which land is put in road construction. It is not logical to assume that the Legislature would have directed the construction of the Dallas-Fort Worth Turnpike but withheld from the agency established to plan and carry out its directions the means of securing the land necessary for the project in its entirety, including that of drainage protection for the road and right of way. There is nothing in the act to indicate that halfway measures were intended; that a road would be built but its continued existence be jeopardized by inadequate drainage of surface waters flowing from or to the right of way except as it might be guarded against to the extent adjacent landowners were willing to sell land. The land to be used for supplemental or secondary facilities which the Legislature obviously meant to place beyond the condemnation powers of the agency are sites for gasoline service stations, restaurants and installations which are not necessary to the primary purpose of a roadway but are added only for the comfort or convenience of the traveler upon the highway. This drainage principle is recognized by the Supreme Court in the

case of State v. Hale, 136 Tex. 29, 146 S.W.2d 731, 736:

"* * * a servitude may be created on land not actually taken or occupied by the public highway, for the purpose of carrying off the water, the natural flow of which is changed or diverted by the construction of such highway."

At the time the referenced case was decided there was no statute which specifically provided for condemnation of land for streambed diversion when the construction of a highway changed a stream's natural flow. It must be concluded that control of the flow of surface water by adequate drainage facilities is inherent in the construction of a roadway and land for that purpose is as necessary as land for the roadbed.

Next considered is the appellants' contention that under their pleadings alleging fraud and bad faith on the part of the Authority, the admissions, affidavits, exhibits and depositions in the record at the summary judgment hearing raised an issue of fact as to the use and necessity of the three drainage tracts which could not be resolved by a summary judgment. Appellants' trial pleading alleges that the Authority "is not acting in good faith in attempting to condemn the drainage easement * * * but to the contrary, is acting fraudulently and in bad faith in that petitioner does not need such tracts for any lawful and authorized purposes under the law, * * * and that it could have reasonably and in good faith constructed an adequate channel for such Coombs Creek within the boundary lines of the right of way as set out in its petition. That the size of such channel * * * is not for the purpose solely of moving the water coming down such Coombs Creek but is to provide a reservoir for storage of water to replace the former Coombs Creek reservoir owned and operated by the City of Dallas and other parties."

The appellants responded to the Authority's motion for partial summary judgment by filing an answer thereto and attaching the affidavit of Harry Boucher together with a copy of the contract entered into by the City of Dallas, Dallas Flood Control District and Texas Turnpike Authority. The deposition and affidavit with exhibits of J. H. Davis, the Turnpike Authority engineer in charge, was on file and made a part of the evidence at the hearing, together with admissions by the Authority filed pursuant to Rules 169 and 170, Vernon's Ann.Texas Rules of Civil Procedure, and from Mr. Davis' deposition appellants call special attention to the following testimony:

"Q. The storage area that is provided by the channel now is sufficient to take the place of the storage channel formerly provided by Coombs Creek basin, is it not; I mean, it is of sufficient size that it would serve the same purpose? A. I must presume that it is. I didn't have anything to do with the design. I couldn't answer that.

"Q. That would be necessary that that be true when they eliminated that basin? A. Yes.

"Q. It was necessary that the channel would have to do that, is that not correct? A. Yes."

In their brief appellants, referring to the hearing record, say:

"Presumably those original plans provided for *necessary* turnpike drainage, else the plan would not have proceeded to the stage of negotiating for purchase. It is clear from Mr. Davis' testimony that the additional easement tracts were not needed to drain the Turnpike. It is equally clear from the record and the evidence that the sole purpose for acquisition of these so-called drainage easements was to provide a new method of control for Coombs Creek into the Trinity River; thereby relieving Appellee of the necessity of building and maintaining a bridge and allowing it to acquire ap-

proximately a half million square feet of right-of-way, it would have otherwise had to purchase or condemn."

As the quoted argument is understood, the appellants say that this evidence establishes a question of fact under summary judgment procedure as to whether the drainage easements taken from Boucher were for the purpose of storing water rather than for the purpose of drainage.

■ The function of the summary judgment procedure is the elimination of patently unmeritorious claims or untenable defenses, and the rule is not intended to deprive litigants of their rights to full hearing on the merits of any real issue of fact. Womack v. Allstate Ins. Co., Tex., 296 S.W.2d 233; Kaufman v. Blackman, Tex.Civ.App., 239 S.W.2d 422, wr. ref., n. r. e. The Supreme Court in Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, quotes with approval from McDonald Texas Civil Practice, Vol. 4, Sec. 17.26, p. 1394, in substance the rationalization that in summary judgment proceedings the court's task is analogous to that which he performs upon motion for directed verdict. The court in performing this duty accepts as true all evidence and inferences reasonably deducible therefrom which tends to support the contention of the party opposing the motion. The court does not weigh the evidence and reasonable inferences therefrom or the credibility of the witnesses to determine the true facts. To this it may be added that the court will look to the entire record before it, and determine whether reasonable minds could reach conflicting conclusions of fact from the evidence. Aydelotte v. Anderson, Tex.Civ. App., 280 S.W.2d 945; English v. Smith Food Stores, Inc., Tex.Civ.App., 289 S.W. 2d 792; Hutchinson v. City of Dallas, Tex. Civ.App., 290 S.W.2d 253; Jones v. Hortenstine, Tex.Civ.App., 291 S.W.2d 761; Maxwell v. Maxwell, Tex.Civ.App., 292 S. W.2d 368.

■ The record presented to the trial court in the summary proceeding, and re-viewed here, does not directly or by inference raise an issue of fraud. In explaining this conclusion, brief reference must be made to some of the principles that govern the Authority in the discharge of its responsibilities. The Legislature committed to the Authority the project of constructing a turnpike between Dallas and Fort Worth, with power to plan its construction and procure their accomplishment. The plan of construction it settled upon in the area described in the contract between the Authority, the City of Dallas and the Flood Control District, in the absence of an abuse of discretion, cannot be reviewed by the courts. See Brazos River Conservation & Reclamation District v. Harmon, 178 S.W.2d 281, wr. ref.; State Highway Commission v. Humphreys, Tex.Civ.App., 58 S.W.2d 144, wr. ref.; San Patricio County v. Maxwell, Tex.Civ.App., 56 S.W. 2d 295; Alexander v. Singleton, Tex.Civ. App., 50 S.W.2d 893, wr. ref.; Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053. And as a matter of fact, appellants do not argue that the contract was ultra vires, unlawful or was made for the fraudulent purpose of making a drainage easement necessary on their land and do not question the propriety of the objects and purposes of the contract or the necessity of the work to be done under the changed plans it occasions as it affects the area described in it. They do assert, though, that as a result of the contract, changes were made in the plans for construction in the area described in the contract and that as a result of those changes a change in the Authority's plans pertaining to drainage in the area of the Boucher land ensued and that the latter plan caused the Authority to take drainage easements on the Boucher land that were not contemplated before negotiation of the contract and that the easements are unnecessary to proper drainage of the turnpike in the area adjacent to the Boucher land and the actual use to which the Boucher land is committed is that of storing water and not drainage.

In an earlier portion of this opinion it was pointed out that protecting the turnpike roadbed and right of way from the ravages of surface and flood waters in proximity to it is inherent in the Authority to build the turnpike. The natural course of Coombs Creek running within and parallel to the turnpike right of way in the vicinity of the Boucher land and the natural flow and floodwaters it carries in normal times are of concern to the Authority. Construction of drainage facilities for the control of the creek's water is a part of the drainage problem the Authority must solve in performing its duties. Whether plans for the control of the Coombs Creek water flow adjoining the Boucher land were incorporated in the original plans or came as a result of changes occasioned by the contract with the City of Dallas and the Flood Control District is not material because the Authority was required to deal with the drainage problem of the turnpike as a whole—floods in the river bottom as well as normal rainfall and water flow. If it may be reasoned that changes in the type of construction of the turnpike resulted from the contract and made it necessary to enlarge Coombs Creek to afford temporary containment under extreme conditions while the water was being pumped into the Trinity, such reasoning does not mean that so handling the flood waters makes the temporary containment any less a phase and part of the overall drainage of the turnpike. There is nothing deducible from any evidence pointed out to this Court that the land to be taken from the Bouchers is to be used for any type of permanent storage. Nor is the land to be used for any purpose not immediately related to and a part of the drainage system of the turnpike right of way. The whole purpose of the easement is to drain the surface and flood water away from the turnpike right of way in the vicinity of the Boucher land as fast as possible and discharge it at a point farther along the right of way into the Trinity at the most expeditious rate.

A brief analysis of the evidence, admissions, affidavits and exhibits before the Court seems in order. The Boucher affidavit and reasonable inferences from it prove only that the Authority offered to buy two tracts of land from him and represented that no additional land would be required if he sold it to them. He did not sell the land to them. Estoppel is not pled or contended as he did not sell and rely upon the representation. The affidavit goes on to say that he was thereafter advised by the Authority that the drainage easements in litigation would be required. The plat attached to the affidavit contains no writing indicating it was a part of a first or later plan, or that the land designated as turnpike tracts was all that would be required from Boucher. There is nothing in this affidavit and exhibit that proves or raises any inference of fraud in connection with the taking of the drainage easements.

The admission of the Authority on file is simply that the drainage easement tracts are not necessary to carry only the water draining off the roadway adjacent to and immediately parallel to the drainage easement. Such admission does not constitute evidence that the drainage easements are not necessary to the overall drainage scheme of the turnpike.

The contract between the Authority, the City of Dallas and the Flood Control District deals with an area approximately half a mile nearer the Trinity River than the Boucher land. After its negotiations the Authority was relieved of building a bridge to span the retention basis as well as certain grading and other work that was contemplated under the original plan. In the prefatory statement of the contract it is said that the change in plans occasioned by the contract will effect a saving to the Authority of $237,500 by dispensing with the necessity of constructing the bridge, etc., but the contract by its terms obligates the Authority to pay, as its share of the cost under the contract, the $237,500 savings to the City of Dallas, thus in actual money-saving there is no gain. The Authority's advantage, if

there is any from the contract, must be in having the different grade and type of construction the contract makes feasible.

The contract recites that some of the work to be accomplished under its terms is for the purpose of draining Coombs Creek directly into the Trinity River. Nothing is said of permanently impounding the waters of the creek.

No evidence so far discussed raises an inference that the easements being condemned are for any use or purpose other than realigning Coombs Creek to more efficiently drain the turnpike. The evidence of Mr. Davis quoted above out of context, and assuming his qualifications to give an opinion, might raise a contrary inference but when it is considered in connection with his entire testimony, no such inference appears. Preceding the question quoted, counsel for the appellants and the witness had been discussing the volume of water which could be handled by the pressure sewer, which was located half a mile east of the appellants' property, and appellants' attorney inquired as to the capacity of the sewer. The witness was speaking of the capacity of a pressure sewer constructed by Army engineers in which he had no part in building or maintaining. His answer in this context was that as he knew nothing of the sewer's design, he must presume the Army engineers knew their business and built the sewer of sufficient size to handle the water running down Coombs Creek without overflowing. Later in his deposition Mr. Davis was asked whether the channel along the Boucher property was designed to store water. He answered that it was not and explained that the new pressure sewer was supposed to move the water out of the area more effectively than the old Coombs Creek retention basis permitted.

■■ From the whole body of evidence considered together it cannot be said that there is anything that supports the appellants' allegation that their land is being taken for the storage of water not related to or pertaining to the drainage system of the turnpike in the area adjacent to the Boucher land.

■■ While fraud is difficult to define, a satisfactory definition is found in Kellum v. Smith, 18 Tex. 835, 836:

"Fraud is * * * any act, omission or concealment, which involves a breach of legal duty, trust or confidence, justly reposed and is injurious to another, or by which an undue and unconscientious advantage is taken of another; * * *."

Facts and inferences showing that alternate plans might be feasible or better adapted to the project and would not require the taking of drainage easements fall short of showing fraud and bad faith in plans which require taking the land for drainage purposes. See 16 Tex.Jur. 401, last par. of Sec. 128, and authorities there cited.

■ By Point 3 appellants urge error was committed in a closely related question; that is, that the trial court erred fundamentally in overruling appellants' motion for instructed verdict in the absence at the final trial of proof that the Authority had performed the conditions prerequisite to its authority to condemn the tracts of land involved.

At the beginning of the trial on the merits the trial judge explained to counsel his construction of the effect of the partial summary judgment, saying: "The specific effect of my ruling is that the Turnpike Authority has made a prima facie case by the affidavit of J. H. Davis; the Board of Directors has in effect authorized a condemnation of the parcels of land involved in this case." At the summary judgment hearing Mr. Davis, the engineer, by his deposition and affidavit testified that he was the custodian of the records of the Authority and what those records revealed. Certified copies of resolutions were introduced showing approval by the Board of Directors of a survey and appraisal of parcels required and the directions to the operating personnel to acquire the

same from Mr. Boucher by purchase, if possible, and if not, by condemnation. This, together with the entire record of the summary proceeding constitutes a prima facie showing of compliance with the prerequisites to condemnation. The appellants did not contest this phase of the Authority's case and no evidence was introduced in the final trial which would controvert the prima facie showing. The court's judgment appears to be correct under authority of Rule 166–A.

Appellants' other points have been carefully examined and a discussion will be omitted in the interest of shortening an already over-long·opinion. It is thought that they do not show reversible error, therefore all of appellants' points are overruled, and the judgment of the trial court is affirmed.